UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CILP ASSOCIATES, L.P. and<br>COHEN POOLED ASSETS, L.P.,<br><br>                              Plaintiffs,<br><br>        -against-<br><br>LIPPER CONVERTIBLES, L.P., LIPPER<br>HOLDINGS, LLC, LIPPER & COMPANY,<br>L.P., KENNETH LIPPER, ABRAHAM<br>BIDERMAN, and<br>PRICEWATERHOUSECOOPERS LLP.<br><br>                              Defendants. | 03 Civ. 2632 (RMB)<br><br>ECF Case |
| ANDREW E. LEWIN, individually and as<br>Trustee of the Regina Gruss Trust f/b/o<br>Andrew Lewin, CLEMENT LEWIN, as<br>Trustee of the Regina Gruss Trust f/b/o<br>Andrew Lewin, and MARINA LEWIN, in<br>their individual capacity and derivatively on<br>behalf of Lipper Convertibles, L.P.,<br><br>                              Plaintiffs,<br><br>        -against-<br><br>LIPPER CONVERTIBLES, L.P., LIPPER<br>HOLDINGS, LLC, LIPPER & COMPANY,<br>L.P., KENNETH LIPPER, ABRAHAM<br>BIDERMAN, and<br>PRICEWATERHOUSECOOPERS LLP.<br><br>                              Defendants. | 03 Civ. 1117 (RMB)<br><br>ECF Case |

**PLAINTIFFS' RESPONSE TO PwC'S STATEMENT OF MATERIAL FACTS, AND
COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH
THERE EXIST AN ISSUE FOR TRIAL, PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern

District of New York, plaintiffs respond to the alleged facts set out in the Statement of Material

Undisputed Facts submitted by PwC in support of its motion for summary judgment:

<u>The Parties and the Partnership</u>

1.   <u>PwC Statement</u>:  Plaintiffs CILP Associates, L.P. ("CILP"), Cohen Pooled Assets, L.P. ("Cohen"), Andrew Lewin, Marina Lewin and the Regina Gruss Trust f/b/o Andrew Lewin (the "Lewin Trust") (collectively, "Plaintiffs") are limited partners of Lipper Convertibles, L.P. ("Convertibles" or the "Partnership").

<u>Plaintiffs' Response</u>:  Undisputed.

2.   <u>PwC Statement</u>:  Convertibles is an investment partnership organized as a New York limited partnership. (Declaration of Joshua M. Cutler in Support of PricewaterhouseCoopers LLP's Motion for Summary Judgment ("Cutler Decl.") Ex. 1.)

<u>Plaintiffs' Response</u>:  Undisputed.

3.   <u>PwC Statement</u>:  From 1995 until 2002, Convertibles operated as a hedge fund engaged in an investment strategy known as convertible arbitrage.  (Cutler Decl. Ex. 2, at LEWIN 0000058; Cutler Decl. Ex. 3, at CILP 0000193; Cutler Decl. Ex. 4, at ¶ 18; Cutler Decl. Ex. 5, at ¶ 16.)

<u>Plaintiffs' Response</u>:   Undisputed.

4.   <u>PwC Statement</u>:  For each of the fiscal years 1995 through 2000, PwC was retained to perform an audit of the Partnership's year-end financial statements in accordance with Generally Accepted Auditing Standards ("GAAS").  (Cutler Decl. Exs. 6-10; Cutler Decl. Ex. 4, at ¶ 3; Cutler Decl. Ex. 5, at ¶ 3; Cutler Decl. Ex. 11.)

<u>Plaintiffs' Response</u>:  Undisputed.

5.   <u>PwC Statement</u>:  Convertibles is governed by an Amended and Restated Limited Partnership Agreement dated as of July 1, 1993 which sets forth the rights and obligations of the partners in the Partnership (the "Partnership Agreement").  (Cutler Decl. Ex. 1.)

<u>Plaintiffs' Response</u>:  Undisputed.

6.    <u>PwC Statement</u>:  The Partnership Agreement required the Partnership to maintain a value of each limited partner's capital contributions on the date those investments were made. (Cutler Decl. Ex. 1, at CILP 0000074.)

<u>Plaintiffs' Response</u>:  Undisputed, except refers to the Partnership Agreement for its complete contents.

7.    <u>PwC Statement</u>:  After a limited partner invested, its capital account would thereafter be debited and credited with proportionate shares of the Partnership's profits, losses and expenses in accordance with the terms of the Partnership Agreement. (Cutler Decl. Ex.1, at CILP 0000069-70, 73-76.)

<u>Plaintiffs' Response</u>:  Undisputed, except refers to the Partnership Agreement for its complete contents.

<u>Convertibles' Securities Portfolio</u>

8.    <u>PwC Statement</u>:  Plaintiffs did not acquire direct ownership of the securities invested in by the Partnership.  (Cutler Decl. Ex. 1, at CILP 0000078-79.)

<u>Plaintiffs' Response</u>:  Undisputed.

9.    <u>PwC Statement</u>:  Convertibles maintained both long and short positions in securities. (Cutler Decl. Ex. 3, at CILP 0000194.)

<u>Plaintiffs' Response</u>:  Undisputed.

10.    <u>PwC Statement</u>:  The long positions were comprised of convertible securities. (Cutler Decl. Ex. 3, at CILP 0000205-06.)

<u>Plaintiffs' Response</u>:  Undisputed.

11.    <u>PwC Statement</u>:  Convertible securities are bonds and preferred equity securities that can be converted into a predetermined number of shares of common stock at the investor's option. (Cutler Decl. Ex. 3, at CLIP 0000194; Cutler Decl. Ex. 12, at *4.)

<u>Plaintiffs' Response</u>:  Undisputed.

12.    <u>PwC Statement</u>:  The short positions were comprised of short sales of the common stocks for which the convertible securities could be exchanged. (Cutler Decl. Ex. 3, at CILP 0000205-06; Cutler Decl. Ex. 12, at *4.)

<u>Plaintiffs' Response</u>:  Undisputed.

13.     PwC Statement:  The valuation of convertible securities is "dependent on many factors and 'is not an exact science.'" (Cutler Decl. Ex. 13, at *5; Cutler Decl. Ex. 15, at *10.)

Plaintiffs' Response:  Undisputed, as a general statement.  However, for purposes of preparation and auditing of Convertibles' financial statements, both GAAP and the Partnership Agreement required that the convertible securities held by Convertibles be valued at the value shown by broker quotes (in the case of the Partnership Agreement, between the last bid and asked price) and did not provide for arbitrary, unsupported addition to readily available market quotations.  Cutler Decl., Ex. 15 at 2-2 to 2-3, 4-3; Cutler Decl, Ex. 1 at CILP 0000007 ("definition of "Market Value" for purposes of determining the value of positions held by Convertibles).

14.     PwC Statement:  "[N]o individual valuation of a convertible security of the type at issue here can be considered accurate with any degree of certainty." (Cutler Decl. Ex. 13, at *5; Cutler Decl. Ex. 12, at *3; Cutler Decl. Ex. 15, at *22.)

Plaintiffs' Response:  Undisputed, as a general statement.  However, for purposes of preparation and auditing of Convertibles' financial statements, both GAAP and the Partnership Agreement required that the convertible securities held by Convertibles be valued at the value shown by broker quotes (in the case of the Partnership Agreement, between the last bid and asked price) and did not provide for arbitrary, unsupported addition to readily available market quotations.  Cutler Decl., Ex. 15 at 2-2 to 2-3, 4-3; Cutler Decl, Ex. 1 at CILP 0000007 ("definition of "Market Value" for purposes of determining the value of positions held by Convertibles).

15.     PwC Statement:  The most active market for convertible securities is the over-the-counter market.  (Cutler Decl. Ex. 13, at *5; Cutler Decl. Ex. 14, at 89-90.

Plaintiffs' Response:  Undisputed.

16.     PwC Statement:  "Although a portion of the convertible preferred stocks held by [Convertibles] may have been listed and quoted on a national securities exchange, a significant portion of the convertible preferred stocks and all of the convertible bonds were unlisted and traded over-the-counter in a dealer-to-dealer market." (Cutler Decl. Ex. 16, at *B-2 (citing January 13, 2006 Deposition of Michael Herman at 245:6-246:2); Cutler Decl. Ex. 14 at 73; Cutler Decl Ex. 17, at 22.)

Plaintiffs' Response:  Undisputed.

17.     PwC Statement:  Because convertible securities were primarily traded in the non-public over-the-counter market, quotes from actual broker-dealers were the best source for determining the value of convertible securities such as those held by the Partnership.  (Cutler Decl. Ex. 13, at *5; Cutler Decl. Ex. 12, at *3, 7, 9-10, 12-13; Cutler Decl. Ex. 14, at 75.)

Plaintiffs' Response:  Undisputed.

<u>PwC's Audits of Convertibles Annual Financial Statements</u>

18.   <u>PwC Statement</u>:  Convertibles' annual financial statements were prepared by and were the responsibility of Convertibles management.  (Cutler Decl. Exs. 6-10; Cutler Decl. Exs. 18-22; Cutler Decl. Ex. 11, at LIP-00-MM-00002; Cutler Decl. Ex. 4, at ¶ 101; Cutler Decl. Ex. 5, at ¶ 99.)

<u>Plaintiffs' Response</u>:  Undisputed.

19.   <u>PwC Statement</u>:  During its annual audits of Convertibles annual financial statements, PwC performed audit testing of managements' valuations of the convertible securities in Convertibles' portfolio each year.  (Cutler Decl. Ex. 16 at *B-5 to B-11; Cutler Decl. Exs. 23-33.)

<u>Plaintiffs' Response</u>:  Undisputed.

20.   <u>PwC Statement</u>:  In his report, Plaintiffs' audit expert – John Barron, CPA ("Barron") – lists certain of the procedures undertaken by PwC to test Convertibles' valuation of its convertible securities.

<u>Plaintiffs' Response</u>:  Undisputed

21.   <u>PwC Statement</u>:  Those procedures, which varied from year to year, included:

> i. learning from the Partnership's managers how it was valuing the securities;
>
> ii. screening those valuations against one or more independent pricing sources;
>
> iii. obtaining price confirmations from broker-dealers who made markets in convertible securities in the over-thecounter market; and
>
> iv. seeking explanations for any unresolved pricing differences for positions greater than $20 million, or exceeding a 2% threshold, depending on the year. (Cutler Decl. Ex. 16, at *B-5 to B-11; Cutler Decl. Exs. 23-33.)

<u>Plaintiffs' Response</u>:  Disputed.  This is an inaccurate and incomplete quotation from Barron's Report, to which we refer for its complete contents, and an inaccurate and incomplete quotation from the documents and testimony on which that report relies.

For example, Mr. Barron did not use the phrase "learning from the Partnership's managers how it was valuing the securities."  In fact, second-year auditors from PwC purported to record conversations with Convertibles' managers, but never gained an adequate understanding of Strafaci's valuation methodology.  For the 1996 audit, second-year auditor Christopher Chapin

prepared a memorandum in which he said, among other things, he said that "quotes are used as the benchmark for the mark and adjusted based on the following market criteria," followed by bullet points. The first bullet point in Mr. Chapin's memo was "weighing of broker sheets based on knowledge and activity of the security, more emphasis is placed on a broker's price if they are a market maker in the convertible." Orel Dec., Ex. I. However, Mr. Chapin could not say how much more evidence was placed on a broker's price if they were a market maker. Orel Dec, Ex. H at 141. The second bullet point said "review the convertible's last trade price of the day or trade price throughout the day." Mr. Chapin could not say which, the last trade price or the price throughout the day. *Id.* at 143. Mr. Chapin then noted that two Lipper traders kept notebooks tracking the daily price fluctuations, and these prices "are reviewed and taken into consideration." Orel Dec, Ex. I. However, Mr. Chapin could not say what he meant by "taken into consideration." Orel Dec, Ex. H at 146. In his third bullet point, Mr. Chapin wrote: "Review the underlying stock's last price (and volume of trading) on the value date. If the closing price of the stock varies significantly, the value of the convertible is adjusted accordingly." Orel Dec, Ex. I. Mr. Chapin could not remember why he wrote that sentence. Orel Dec, Ex. H at 148. Mr. Chapin could not say from what a price might "var[y] significantly." *Id.* at 149-50. Mr. Chapin's final bullet point was: "Contact other traders to see the current market price of the security." Orel Dec. Ex. I. Mr. Chapin could not say what "current market price" meant. Orel Dec. Ex. H at 153.

For the 1997 audit, a second year auditor (Jesse Tracey) issued a memorandum virtually identical to, and concededly based on, Mr. Chapin's. Orel Dec. Ex. K; Ex. J at 28, 74-78.

PwC sought price confirmations from broker-dealers, and then ignored those confirmations in favor of Strafaci's subjectively increased marks.

There is no evidence that PwC sought explanations for price variances in the 1999 or 2000 audits.

      22.    <u>PwC Statement</u>: The valuations of convertible securities held by the Partnership were "estimates" as that term is defined in American Institute of Certified Public Accountants Codification of U.S. Auditing Standards ("AU") § 342. (Cutler Decl. Ex. 13, at *6.)

  <u>Plaintiffs' Response</u>: Undisputed.

      23.    <u>PwC Statement</u>: In testing the valuation of the convertible securities, "[s]ince no one accounting estimate can be considered accurate with certainty, the auditor recognizes that a difference between an estimated amount best supported by the audit evidence and the estimated amount included in the financial statements may be reasonable, and such a difference would not be considered to be a likely misstatement." (Cutler Decl. Ex. 34; Cutler Decl. Ex. 14, at 102-03; Cutler Decl. Ex. 13, at *5)

  <u>Plaintiffs' Response</u>: This is a quotation from PwC'e s expert opinion, not a statement of material fact. The citation to Barron's rebuttal report is misleading, he also says that PwC's expert "ignores the fact that management's valuation estimates were nearly always higher than the prices obtained by PwC from broker-dealers and other independent sources." Cutler Decl. Ex. 13 at 5.

24.    PwC Statement:  "[T]he auditor may use a range of acceptable amounts to determine the reasonableness of amounts recorded." (Cutler Decl. Ex. 13, at *5.)

Plaintiffs' Response:  This is a quotation from PwC'e s expert opinion, not a statement of material fact.  The citation to Barron's rebuttal report is misleading, he also says that PwC's expert "ignores the fact that management's valuation estimates were nearly always higher than the prices obtained by PwC from broker-dealers and other independent sources." Cutler Decl. Ex. 13 at 5.

25.    PwC Statement:  "[I]f the difference [between management's estimate and the auditor's expectation for the value of a security or securities] is clearly inconsequential, either in terms of percentage or absolute dollar amount of difference," there is no requirement that the auditor follow up on that difference. (Cutler Decl. Ex. 14, at 118-19, 130.)

Plaintiffs' Response:  Undisputed.

26.    PwC Statement:  It is "a matter of judgment" as to which differences are inconsequential and thus do not require further follow-up by the auditors.  (Cutler Decl. Ex. 14, at 118-19.)

Plaintiffs' Response:  That is an incomplete quote from Barron's deposition, and moreover does not appear on the referenced transcript pages.  First, he was speaking of hypothetical differences that are not just inconsequential but "clearly inconsequential." Cutler Dec. Ex. 114, p. 119. Second, Barron testified that "the amount of absolute dollar difference is probably more important to criteria than the percentage.  Clearly, if you had a very small investment and it was off by 20 percent, I'm not sure I would really get all that concerned about it." Id., p. 120.  With respect to judgment, Barron testified: "In terms of criteria, how do I decide as the auditor which differences to investigate and which ones I'm not.  That's a matter of judgment first of all.  That judgment needs to be based on essentially the effect of those valuation differences.  What effect does it have on the financial statements taken as a whole." Id.  PwC never made any judgment with respect to the effect on Lipper Convertibles' financial statements of the differences between Strafaci's marks and the independently obtained marks.  Cutler Ex., Ex. 13 at 2-16 to 2-17, 3-6 to 3-10.

27.    PwC Statement:  Where the initial differences between the auditor's expectation and management's estimate are too large to dismiss as inconsequential, the auditor could still become comfortable with the reasonableness of that estimate by either testing management's estimation process or by corroborating management's estimate through further testing. (Cutler Decl. Ex. 14, at 105-06, 130.)

Plaintiffs' Response:  Undisputed.

28.    PwC Statement:  Where, in response to an initial difference between management's estimate and the auditor's expectation, the auditor chooses to test the reasonableness of management's estimate through further testing and "[finds] through the result of

that testing that there were in fact valid reasons for these differences, then they could become satisfied [with management's estimate]." (Cutler Decl. Ex. 14, at 130.)

Plaintiffs' Response:  Undisputed, although as worded this is a hypothetical expression of plaintiffs' expert, not a statement of fact drawn from the facts of this lawsuit.

29.   PwC Statement:  "It was . . . appropriate for PwC to obtain and rely upon prices from broker-dealers to determine whether the Funds' valuations were reasonable." Cutler Decl, Ex. 13 at *5.)

Plaintiffs' Response:  Undisputed, except as Barron noted, PwC did not in fact rely upon quotes from broker-dealers but rather accepted Strafaci's subjective adjustments to same without further explanation or corroboration.  "Because it lacked sufficient and competent audit evidence to support the reasonableness of the differences between the prices obtained by PwC and the Funds' values, PwC should have considered such differences to be errors."  Cutler Decl, Ex. 13 at *6.

30.   PwC Statement:  One way to obtain and test against those prices is through confirmation requests to the broker-dealers.  (Cutler Decl. Ex. 14, at 167-70.)

Plaintiffs' Response:  Undisputed.

31.   PwC Statement:  AU 330 recognizes that such confirmations may be "blank" forms that request that the respondents provide the requested information (here, price), or they may contain the audited information (price) and request the respondent to verify its accuracy or reasonableness.  (Cutler Decl. Ex. 14, at 168-69.)

Plaintiffs' Response:  Undisputed.

32.   PwC Statement:  A drawback to blank confirmations is that they may result in a lower response rate. (Cutler Decl. Ex. 14, at 168-69.)

Plaintiffs' Response:  Undisputed.


### 1996 Audit Testing

33.   PwC Statement:  For year end 1996, PwC selected for testing approximately 69% of Convertibles' convertible securities portfolio by value, including all positions valued greater than $20 million. (Cutler Decl. Ex. 23, at LIP-66-LC-00315 to 316; Cutler Decl. Ex. 16, at *B-5 to B-6.)

Plaintiffs' Response:  Undisputed.

34.   PwC Statement:  As an initial test, it compared the prices Convertibles assigned to these securities to an average of prices that were obtained from various broker-

provided quote sheets. (Cutler Decl. Ex. 23, at LIP-96-LC-00312, 315 to 316; Cutler Decl. Ex. 16, at *B-5.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        35.   <u>PwC Statement</u>:  PwC received broker-provided quote sheets from Convertibles, and then sent those quote sheets to individual brokers for confirmation.  (Cutler Decl. Ex. 23, at LIP-96-LC-00312; Cutler Decl. Ex. 24, at LIP-96-LC-00702 to 732.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        36.   <u>PwC Statement</u>:  The confirmations were sent to John Keating (Prudential Securities), Tina (JP Morgan), John Burgess (Bear Stearns), Gary (Merrill Lynch), and David Harris (BT Securities). (Cutler Decl. Ex. 24, at LIP-96-00702.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        37.   <u>PwC Statement</u>:  The confirmation instructions asked that the recipients "confirm that you supplied our client with the attached broker quotes at 12/31/96 by signing your name and title to each page." (Cutler Decl. Ex. 24, at LIP-96-LC-00703.)

   <u>Plaintiffs' Response</u>:

        38.   <u>PwC Statement</u>:  Each of the five confirms was returned.  (Cutler Decl. Ex. 24, at LIP-96-LC-00702; Cutler Decl. Ex. 25, at LIP-96-LC-00331 to 361.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        39.   <u>PwC Statement</u>:  In the aggregate, the valuation placed on the convertible securities that were tested by PwC deviated from the average of the broker quotations by 2.16%. (Cutler Decl. Ex. 23, at LIP-96-LC-00316; Cutler Decl. Ex. 16, at *B-6; Cutler Decl. Ex. 35, at *5.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        40.   <u>PwC Statement</u>:  PwC investigated variances in the valuations of portfolio securities (also referred to as "marks") through discussions with one of the convertible traders for Convertibles, Mike Herman.  (Cutler Decl. Ex. 23, at LIP-96-LC-00315; Cutler Decl. Ex. 16, at *B-6.)

   <u>Plaintiffs' Response</u>:   Undisputed.

        41.   <u>PwC Statement</u>:  The auditors determined in their judgment that the individual variances were satisfactorily explained. (Cutler Decl. Ex. 23, at LIP-96-LC-00312 to 316; Cutler Decl. Ex. 16, at *B-6.)

Plaintiffs' Response:  Disputed.  The memo of PwC second-year auditor Christopher Chapin does state that all variances were satisfactorily explained, and this is accurately quoted in Barron's report.  However, neither document uses the phrase "determined in their judgment," nor is there any evidence that "judgment" was used.

<u>1997 Audit Testing</u>

42.    <u>PwC Statement</u>:  For year end 1997, PwC selected for testing approximately 74% of Convertibles' convertible securities portfolio by value, including all positions valued greater than $20 million. (Cutler Decl. Ex. 26, at LIP-97-LC-00338, 342 and 344; Cutler Decl. Ex. 16, at *B-6.)

Plaintiffs' Response:  Undisputed.

43.    <u>PwC Statement</u>:  As an initial test, it compared the prices Convertibles assigned to quote sheets. (Cutler Decl. Ex. 26, at LIP-97-LC-00338, 342 and 344; Cutler Decl. Ex. 16, at *B-6.)

Plaintiffs' Response:  Undisputed.

44.    <u>PwC Statement</u>:  PwC received broker-provided quote sheets from Convertibles, and then sent those quote sheets to individual brokers for confirmation.  (Cutler Decl. Ex. 26, at LIP-97-LC-00338; Cutler Decl. Ex. 27, at LIP-97-LC-01479 to 1559.)

Plaintiffs' Response:  Undisputed.

45.    <u>PwC Statement</u>:  The confirmations were sent to John Keating (Prudential Securities), Tina (JP Morgan), John Burgess (Bear Stearns), Dave Gary and Joe Manning (Merrill Lynch), Anita Nivel (BT Securities), Frank Almodovar (Morgan Stanley), Louie (Lehman Brothers), Kevin (First Brokers), Craig Manchuk (DLJ), Ron (Cuttone & Co.), Joe Reitano (Patriot Security), and Doug Burke (Eurobrokers).  (Cutler Decl. Ex. 27, at LIP-97-LC-01479 to 1559.)

Plaintiffs' Response:  Undisputed.

46.    <u>PwC Statement</u>:  The instructions asked that the recipients "confirm that you supplied our client with the attached broker quotes at 12/31/97 by signing your name and title to each page." (Cutler Decl. Ex. 27, at LIP-97-LC-01480.)

Plaintiffs' Response:  Undisputed.

47.    <u>PwC Statement</u>:  Nine confirmations were returned, while another confirm received no response and another broker simply responded that it no longer had the original quote sheet to compare to. (Cutler Decl. Ex. 27, at LIP-97-LC-01560 to 1608.)

Plaintiffs' Response:  Undisputed.

48.    PwC Statement:  In the aggregate, the valuation placed on the convertible securities that were tested by PwC deviated from the average of the broker quotations by 2.57%. (Cutler Decl. Ex. 26, at LIP-97-LC-00344; Cutler Decl. Ex. 16, at *B-6; Cutler Decl. Ex. 35, at *5.)

Plaintiffs' Response:    Undisputed.

49.    PwC Statement:  PwC investigated variances in the valuations of portfolio securities (Cutler Decl. Ex. 26, at LIP-97-LC-00342; Cutler Decl. Ex. 16, at *B-6.)

Plaintiffs' Response:    Disputed.  PwC conducted no "investigation" of the variances in valuations of Convertibles' portfolio of securities.  Neither of the documents cited uses that word.

50.    PwC Statement:  The auditors determined in their judgment that the individual variances were satisfactorily explained.  (Cutler Decl. Ex. 26, at LIP-97-LC-00338, 342; Cutler Decl. Ex. 16, at *B-6.)

Plaintiffs' Response:    Disputed.  The memo of PwC second-year auditor Jesse Tracey does state that all variances were satisfactorily explained, and this is accurately quoted in Barron's report. However, neither document uses the phrase "determined in their judgment," nor is there any evidence that "judgment" was used.

### 1998 Audit Testing

51.    PwC Statement:  For year end 1998, PwC selected for testing approximately 72% of Convertibles' convertible securities portfolio by value.  (Cutler Decl. Ex. 28, at LIP-98-MM-00730, 737-738; Cutler Decl. Ex. 16, at *B-7.)

Plaintiffs' Response:    Undisputed.

52.    PwC Statement:  As an initial test, PwC compared the prices Convertibles assigned to these securities to prices that were obtained from various broker responses to confirmation requests and/or through Bloomberg.  (Cutler Decl. Ex. 28, at LIP-98-MM00728, 730, 737-738; Cutler Decl. Ex. 16, at *B-7.)

Plaintiffs' Response:    Undisputed.

53.    PwC Statement:  The confirmations PwC sent were sent to John Keating (Prudential), John Burgess (Bear Stearns), Frank Almodovar (Morgan Stanley), John Satenstein (DLJ), Ted Walkowitz and Kathleen Wright (First Boston), Tina Fenton (JP Morgan), Howard Wetschner (Goldman Sachs), J.C. Delreal and Jim Conaley (Salomon Smith Barney), Joe Reitano (Patriot), Kevin Crouchley and Greg Ori (First Brokers), Doug Burke (Eurobrokers); Joe Mula (Fahnestock); Robert Ryon (Oppenheimer) and Bill Horton (BT Alex Brown). (Cutler Decl. Ex. 29, at LIP-98-LC-00521 to 558.)

Plaintiffs' Response:    Undisputed.

54.     PwC Statement:  The confirmations provided to each broker included a list of convertible securities, identified by a description, symbol, coupon rate and maturity dates (if applicable) and a conversion rate. (See, e.g., Cutler Decl. Ex. 29, at LIP-98-LC-00523 to 524.)

Plaintiffs' Response:  Undisputed.

55.     PwC Statement:  A "Price at 12/31/98" column was left blank, and recipients were asked to respond by "providing [PwC] with prices as of December 31, 1998 for the attached list of convertible securities" and to "sign the page with your name and title after inputting the prices." (See, e.g., Cutler Decl. Ex. 29, at LIP-98-LC-00523 to 524.)

Plaintiffs' Response:  Undisputed.

56.     PwC Statement:  Eight confirmations were returned. (Cutler Decl. Ex. 29, at LIP98-LC-00522, 559 to 571.)

Plaintiffs' Response:  Undisputed.

57.     PwC Statement:  Some recipients provided prices for all or nearly all of the securities on the confirmation, while others provided only a few security prices. (Cutler Decl. Ex. 29, at LIP-98-LC-00559 to 571.)

Plaintiffs' Response:  Undisputed.

58.     PwC Statement:  In some cases the brokers provided a range of prices, and brokers often differed from one another as to the price for the same security.  (Cutler Decl. Ex. 29, at LIP-98-LC-00559 to 571.)

Plaintiffs' Response:  Undisputed.

59.     PwC Statement:  In the aggregate, the valuation placed by Lipper management on the convertible securities that were tested by PwC deviated from the marks that PwC calculated from the responses to its confirmations and Bloomberg inquiries by 5.50%. (Cutler Decl. Ex. 28, at LIP-98-MM-00737 to 738; Cutler Decl. Ex. 16, at *B-7; Cutler Decl. Ex. 35, at *5.)

Plaintiffs' Response:  Undisputed.

60.     PwC Statement:  PwC investigated that variance through discussions with Convertibles' head trader, Edward Strafaci.  (Cutler Decl. Ex. 28, at LIP-98-MM-00730; Cutler Decl. Ex. 16, at *B-8.)

Plaintiffs' Response:  Disputed.  PwC's discussion with Strafaci did not constitute an "investigation," nor is there evidence that more than one such discussion occurred.

61.    PwC Statement:  Mr. Strafaci provided the auditors with an explanation of the variances and his methodology for determining prices.  (Cutler Decl. Ex. 28, at LIP-98-MM-00730; Cutler Decl. Ex. 16, at *B-8.)

Plaintiffs' Response:  Undisputed to the extent that Mr. Strafaci purported to provide an explanation, but disputed to the extent that there is any suggestion that the second-year auditor to whom the explanation was provided, Sheara Fredman, or any other PwC auditors, understood that explanation.

<u>1999 Audit Testing</u>

62.    PwC Statement:  For year end 1999, PwC selected for testing approximately 73% of Convertibles' convertible securities portfolio by value.  (Cutler Decl. Ex. 30, LIP-99MM-01213; Cutler Decl. Ex. 16, at *B-8.)

Plaintiffs' Response:  Undisputed.

63.    PwC Statement:  PwC's initial test compared the prices Convertibles assigned to these securities to prices that PwC obtained from Bloomberg.  (Cutler Decl. Ex. 30, LIP99-MM-01205; Cutler Decl. Ex. 16, at *B-8.)

Plaintiffs' Response:  Undisputed.

64.    PwC Statement:  For each security where Convertibles' mark differed from the mark obtained through Bloomberg by more than 2%, PwC placed those securities and the Lipper-provided mark on a schedule attached to a confirmation that was sent to several broker-dealers who actively trade in the convertible securities market.  (Cutler Decl. Ex. 30, LIP-99-MM-01213; Cutler Decl. Ex. 31, LIP-99-LC-00344 to 370; Cutler Decl. Ex. 16, at *B-9.)

Plaintiffs' Response:  Undisputed.

65.    PwC Statement:  The confirmations were sent to Tina Fenton (Merrill Lynch), Frank Almodovar (Morgan Stanley), Bob Deverna (Prudential), Ted Walkowicz (First Boston), and Mike Rinaldi (Lehman Brothers). (Cutler Decl. Ex. 31, LIP-99-LC-00353 to 370.)

Plaintiffs' Response:  Undisputed.

66.    PwC Statement:  Three confirmations were returned.  (Cutler Decl. Ex. 31, LIP-99LC-00347 to 352; Cutler Decl. Ex. 16, at B-9.)

Plaintiffs' Response:  Undisputed

67.    PwC Statement:  One stated "Best Efforts, Prices Look good!" (Cutler Decl. Ex. 31, LIP-99-LC-00348 (underlining in original).)  It was signed by John P. Carroll at Prudential Securities. (Cutler Decl. Ex. 31, LIP-99-LC-00348.)

<u>Plaintiffs' Response</u>:  Undisputed.

68.     <u>PwC Statement</u>:  Another was returned with a check mark next to each of indicating his position as a Vice President at Morgan Stanley. (Cutler Decl. Ex. 31, LIP99-LC-00350.)

<u>Plaintiffs' Response</u>:  Undisputed.

69.     <u>PwC Statement</u>:  The last confirmation, which had originally been sent to Ted Walkowicz at First Boston, was returned with an alternative set of bid and ask prices for most of the securities and was signed and dated by Maria Barhu, who indicated that she was a "sales assistant." (Cutler Decl. Ex. 31, LIP-99-LC-00351 to 352.)

<u>Plaintiffs' Response</u>:  Undisputed.

<u>2000 Audit Testing</u>

70.     <u>PwC Statement</u>:  For year end 2000, PwC selected for testing approximately 66% of Convertibles' convertible securities portfolio by value.  (Cutler Decl. Ex. 32, LIP-00MM-00957; Cutler Decl. Ex. 16, at *B-10.)

<u>Plaintiffs' Response</u>:  Undisputed.

71.     <u>PwC Statement</u>:  PwC's initial test for 2000 again compared the prices Convertibles assigned to these securities to prices that PwC obtained from Bloomberg. (Cutler Decl. Ex. 32, LIP-00-MM-00950 to 52; Cutler Decl. Ex. 16, at *B-10.)

<u>Plaintiffs' Response</u>:  Undisputed.

72.     <u>PwC Statement</u>:  For each security where Convertibles' mark differed from the mark obtained through Bloomberg by more than 2%, PwC placed those securities and the Lipper-provided mark on a confirmation that was sent to several broker-dealers who actively trade in the convertible securities market.  (Cutler Decl. Ex. 32, LIP-99-MM00950 to 52; Cutler Decl. Ex. 33, at LIP-00-MM-00267 to 77; Cutler Decl. Ex. 16, at *B11.)

<u>Plaintiffs' Response</u>:  Undisputed.

73.     <u>PwC Statement</u>:  The confirmations were sent to Andrew Basa (Merrill Lynch), Douglas Burke (UBS Warburg), Mike Schwartz (Morgan Stanley), Mike Rinalde (Lehman Brothers), Tom Hehman (Prudential), and Kathleen Wright. (Cutler Decl. Ex. 33, at LIP-00-MM-0267 to 77.)

<u>Plaintiffs' Response</u>:  Undisputed.

14

74.     <u>PwC Statement</u>:  Four confirmations were returned with signatures from the recipients without any changes to the prices contained on the confirmation.   (Cutler Decl. Ex. 33, at LIP-00-MM-00254 to 66; Cutler Decl. Ex. 16, at *B-11.)

<u>Plaintiffs' Response</u>:  Undisputed.

75.     <u>PwC Statement</u>:  Those confirmations came from Douglas Burke of UBS Warburg, Mike Schwartz of Morgan Stanley, Mike Rinalde of Lehman Brothers, and Tom Heaman of Prudential Securities. (Cutler Decl. Ex. 33,  at LIP-00-MM-00254 to 66.)

<u>Plaintiffs' Response</u>:  Undisputed, except Mr. Hehman's name is misspelled.

76.     <u>PwC Statement</u>:  A fifth confirmation which had been sent to Andrew Basa at Merrill Lynch was returned with changes to the prices for 8 of the securities listed on the confirmation. (Cutler Decl. Ex. 33,  at LIP-00-MM-00250 to 53; Cutler Decl. Ex. 16, at *B-11.)

<u>Plaintiffs' Response</u>:  Undisputed, except notes that the document speaks for itself.

77.     <u>PwC Statement</u>:  Based on the audit evidence it obtained, PwC opined in each of the audit reports at issue that the Partnership's "basic financial statements taken as whole," "present[ed] fairly, in all material respects, the financial position of Convertibles, . . . in conformity with [GAAP]," as of the respective year-end.  (Cutler Decl. Exs. 6-10.)

<u>Plaintiffs' Response</u>:  Undisputed.

78.     <u>PwC Statement</u>:  PwC's audit opinions stated that: "We conducted our audit of these financial statements in accordance with auditing standards generally accepted in the United States of America which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion." (Cutler Decl. Exs.  6-10.)

<u>Plaintiffs' Response</u>:  Undisputed.

79.     <u>PwC Statement</u>:  Each of the opinions was issued approximately two months after the close of the fiscal years to which it related.  (Cutler Decl. Exs. 6-10.)

<u>Plaintiffs' Response</u>:  Undisputed.

80.     <u>PwC Statement</u>:  PwC did not issue an audit opinion in respect of the management-prepared financial statements for Convertibles for year end 2001.  Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1, 5 (N.Y. 2007).

<u>Plaintiffs' Response</u>:  Undisputed.

## NASD Examination of Convertibles and its Affiliates

81.    PwC Statement:  Convertibles and each of its affiliate convertible arbitrage hedge funds were members of the National Association of Securities Dealers ("NASD").  (Cutler Decl. Ex. 2, at LEWIN 0000070; Cutler Decl. Ex. 36, at pp. CLIP 0000133-34; Cutler Decl. Ex. 37, at LIP-007062.)

Plaintiffs' Response:  Undisputed.

82.    PwC Statement:  Convertibles was a registered broker-dealer. (Cutler Decl. Ex. 2, at LEWIN 0000069.)

Plaintiffs Response:  Undisputed.

83.    PwC Statement:  As members of NASD, Convertibles and its affiliate convertible arbitrage funds were subject to regulatory audits by the NASD.  (Cutler Decl. Ex. 38; Cutler Decl. Ex. 39.)

Plaintiffs' Response:  Undisputed.

84.    PwC Statement:  One of the areas typically tested by NASD during such examinations is the member firm's net capital calculation, which in turn depends upon the member's valuations of its portfolio securities. (Cutler Decl. Ex. 40, at SF 00152; Cutler Decl. Ex. 39.)

Plaintiffs' Response:  Undisputed.

85.    PwC Statement:  As part of those examinations, on at least two separate occasions, NASD examiners observed that the pricing of convertible securities by Convertibles' head trader was higher than prices that the NASD examiner had obtained from public sources. (Cutler Decl. E x. 41, at SF 00176; Cutler Decl. Ex. 42, at *2-3.)

Plaintiffs' Response:  Undisputed.

86.    PwC Statement:  In both instances the NASD examination team ultimately determined, after further inquiry, that the convertible securities portfolios were not overvalued. (Cutler Decl. Ex. 38, at SF 00194; Cutler Decl. Ex. 39, at SEC-ES007749 to 50.)

Plaintiffs' Response:  Undisputed.

## 1998 NASD Examination

87.    PwC Statement:  The NASD conducted an examination of Convertibles in late 1998.  The NASD's initial comparison of the marks that Convertibles assigned to its

convertible securities to pricing determined by the NASD examination team indicated that Convertibles had overvalued its long securities by approximately $168 million.  (Cutler Decl. Ex. 41, at SF 00176.)

  Plaintiffs' Response:  Undisputed.

        88.    PwC Statement:  Upon further examination, however, the NASD examination team revised its own valuations and ultimately issued a letter of caution indicating that Convertibles may be undervaluing its convertible securities by $90 million.  (Cutler Decl. Ex. 38, at SF 00194.)

  Plaintiffs' Response:  Undisputed.

2000 NASD Examination

        89.    PwC Statement:  During an examination in the summer of 2000 of Convertibles' offshore affiliate, Lipper Offshore Convertibles, L.P., the NASD noted that "[o]ut of fifteen bonds sampled, twelve were priced differently by the firm than was found on Bloomberg." (Cutler Decl. Ex. 39, at SEC-ES007750.)

  Plaintiffs' Response:  Undisputed.

        90.    PwC Statement:  The NASD examination staff stated in its final report that it "realizes that Bloomberg is but one source, and [the NASD] cannot rely sole[l]y on their prices." (Cutler Decl. Ex. 39, at SEC-ES007750.)

  Plaintiffs' Response:  Undisputed.

        91.    PwC Statement:  After completing its follow-up investigation, the NASD examiners determined that "no further review is needed, and that no rule violation be charged" with respect to the valuation of the convertible securities.  (Cutler Decl. Ex. 43; Cutler Decl. Ex. 39, at SEC-ES007750; Cutler Decl. Ex. 44.)

  Plaintiffs' Response:  Undisputed.

Plaintiffs' Investments in Convertibles

        92.    PwC Statement:  Plaintiffs' investments in Convertibles were solicited by Convertibles' management.  (Cutler Decl. Ex. 4, at ¶¶ 20-51; Cutler Decl. Ex. 5, at ¶¶ 18-49.)

  Plaintiffs' Response:  Undisputed.

        93.    PwC Statement:  None of the Plaintiffs communicated with PwC about Convertibles or its affiliates at any time leading up to or during their investments in those funds.

17

(Cutler Decl. Ex. 45, at 20; Cutler Decl. Ex. 46, at 85-86; Cutler Decl. Ex. 47, at 47; Cutler Decl. Ex. 48, at 38.)

Plaintiffs' Response:   Undisputed.

94.    PwC Statement:   Neither CILP nor Cohen received any of PwC's audit opinions in respect of Convertibles prior to investing in Convertibles. (Cutler Decl. Ex. 48, at 39, 43, 47.)

Plaintiffs' Response:   Undisputed.

95.    PwC Statement:   Andrew Lewin, Marina Lewin and the Regina Gruss Trust f/b/o Andrew Lewin allege that the Partnership's management provided them with PwC's 1997 audit opinion prior to making their investments.   (Cutler Decl. Ex. 5, at ¶ 30.)

Plaintiffs' Response:   Undisputed.

96.    PwC Statement:   Pursuant to SEC rules and regulations, Convertibles was a restricted investment partnership that was open only to sophisticated investors meeting certain asset and/or income thresholds (termed "accredited investors" by the SEC).   (Cutler Decl. Ex. 50, at CILP 0000247.)

Plaintiffs' Response:   Undisputed.

97.    PwC Statement:   Prior to investing, each Plaintiff received from Convertibles' Cutler Decl. Ex. 3; Cutler Decl. Ex. 5, at ¶ 25, 48-49; Cutler Decl. Ex. 4, at ¶¶ 11, 40, 46.)

Plaintiffs' Response:   Undisputed.

98.    PwC Statement:   Specifically, Plaintiffs received private offering memoranda from Convertibles' management that presented past performance statistics for Convertibles and indicated that those performance numbers were based on "the audited results of the operations" of Convertibles.   (Cutler Decl. Ex. 2, at LEWIN 00000056-57; Cutler Decl. Ex. 3, at CILP 0000191-93.)

Plaintiffs' Response:   Undisputed.

99.    PwC Statement:   The private offering memoranda were not audited by PwC. (Cutler Decl. Ex. 2; Cutler Decl. Ex. 3.)

Plaintiffs' Response:   Undisputed, but the private offering memoranda recited financial results that had been audited by PwC. Cutler Dec. Ex. 2 at LEWIN 0057; Ex. 3 at 0193; ¶ 98, above.

18

   100. <u>PwC Statement</u>:  Each of the Lewin Action plaintiffs received a private offering memorandum for Convertibles dated December 31, 1997 prior to making his, her or its first investment in Convertibles. (Cutler Decl. Ex. 5, at ¶¶ 25, 48-49.)

 <u>Plaintiffs' Response</u>:  Undisputed.

   101. <u>PwC Statement</u>:  Each of the CILP Action plaintiffs received a private offering memorandum for Convertibles dated July 1, 2000 ("the 2000 Offering Memorandum") prior to making his, her or its first investment in Convertibles. (Cutler Decl. Ex. 4, at ¶¶ 11, 40, 46.)

 <u>Plaintiffs' Response</u>:  Undisputed.

   102. <u>PwC Statement</u>:  The private offering memoranda for Convertibles stated that an investment in Convertibles "involves a significant degree of risk."  (Cutler Decl. Ex. 2, at LEWIN 00000067; Cutler Decl. Ex. 3, at CILP 0000203.)

 <u>Plaintiffs' Response</u>:  Undisputed, although this fact is not material to PwC's motion.

   103. <u>PwC Statement</u>:  The private offering memoranda also stated, inter alia, that the investment activities of the Partnership are inherently "speculative" and that "[t]he Partnership's performance over a particular period will not necessarily be indicative of for the Partnership, therefore, are not possible, and have not been furnished to potential investors." (Cutler Decl. Ex. 2, at LEWIN 00000067; Cutler Decl. Ex. 3, at CILP 0000203.)

 <u>Plaintiffs' Response</u>:  Undisputed, although this fact is not material to PwC's motion

   104. <u>PwC Statement</u>:  The 2000 Private Offering Memorandum further stated that "[t]here can be no assurance that . . . there will be any return of capital, and investment results may vary substantially on an annual basis.  The Interests are suitable for investment only by sophisticated individuals and institutions who fully understand and are capable of assuming the risks of this investment." (Cutler Decl. Ex. 3, at CILP 0000203.)

 <u>Plaintiffs' Response</u>:  Undisputed, although this fact is not material to PwC's motion

   105. <u>PwC Statement</u>:  The 2000 Private Offering Memorandum also stated that "[t]he Partnership may acquire convertible securities that are not of investment grade quality, referred to as 'high yield securities.' . . . The secondary markets for high yield securities are not as liquid as the secondary market for higher-rated securities. . . . In addition, the trading volume for high yield securities is generally lower than that for higher rated securities. . . . These factors may have an adverse effect on the Partnership's ability to dispose of particular portfolio investments and may limit its ability to obtain accurate market quotations for purposes of valuing securities and calculating net asset value. If the Partnership is not able to obtain precise or accurate market quotations for a particular security, it will become more difficult for the Partnership to value its portfolio securities and it may have to use a greater degree of judgment in making such valuations. . . . Less liquid secondary markets may also affect the Partnership's ability to sell securities at their

fair value. If the secondary markets for high yield securities contract due to adverse Partnership may become illiquid and the proportion of its assets invested in illiquid securities may increase." (Cutler Decl. Ex. 3, at CILP 0000205-06.)

Plaintiffs' Response:  Undisputed.

106.   PwC Statement:  Prior to investing in Convertibles, each Plaintiff certified that he, she or it "has such knowledge and experience in financial, business and investment matters that" the limited partner was "capable of evaluating the merits and risks of [the] investment" in the Partnership and realized that an investment in the Partnership "involves a very high degree of risk." (Cutler Decl. Ex. 50, at CILP 0000246; Cutler Decl. Ex. 51, at CILP 0000271; Cutler Decl. Ex. 52, at LEWIN 0000003-4; Cutler Decl. Ex. 53, at LEWIN 0000034-35; Cutler Decl. Ex. 54, at LEWIN 0000236; Cutler Decl. Ex. 5, at ¶¶ 46-48; Cutler Decl. Ex. 4, at ¶¶ 44-46.)

Plaintiffs' Response:  Undisputed, although this fact is not material to PwC's motion

107.   PwC Statement:  Plaintiffs invested in Convertibles on the following dates:
a. Andrew Lewin and Marina Lewin (through their joint account) – May 1, 1998 (by $500,000 cash investment) and January 1, 2001 (by transfer of partnership interest from Convertibles' affiliate fund, Lipper Convertibles Series II, L.P. ("Series II")) (Cutler Decl. Ex. 55, at Response No. 1);
b. Andrew Lewin (through his personal account) – January 1, 2001 (by transfer of partnership interest from Series II) and April 1, 2001 (by $316,587 cash investment) (Cutler Decl. Ex. 55, at Response No. 1);
c. Lewin Trust – January 1, 2001 (by transfer of partnership interest from Series II) (Cutler Decl. Ex. 55, at Response No. 1);
d. CILP – January 1, 2001 (by transfer of partnership interest from Series II) (Cutler Decl. Ex. 56, at Response No. 1);
e. Cohen – November 1, 2000 (by $1.5 million cash investment) (Cutler Decl. Ex. 56, at Response No. 1).

Plaintiffs' Response:  Undisputed.

108.   PwC Statement:  Andrew Lewin, in his individual account, and Andrew and Marina Lewin, through their joint account, also made periodic withdrawals from Convertibles. (Cutler Decl. Ex. 55, at Response No. 1.)

Plaintiffs' Response:  Undisputed.

109.   PwC Statement:  Where Plaintiffs invested by a transfer of partnership interests in Series II, that transfer was accomplished by an in-kind transfer of securities from Series II to Convertibles.  (Cutler Decl. Ex. 57, at CILP 000707.)

Plaintiffs' Response:  Undisputed.

<u>The Write Down and Liquidation of Convertibles</u>

110.    PwC Statement:  On January 14, 2002, Edward Strafaci, Convertibles' head trader, left the General Partner. (Cutler Decl. Ex. 58, at *1.)

Plaintiffs' Response:  Undisputed.

111.    PwC Statement:  On February 20, 2002, the General Partner sent a letter to the limited partners announcing that its year-end valuation of the securities in the Partnership's portfolio would reflect a reduction in value versus the marks it had calculated for November 30, 2001. (Cutler Decl. Ex. 58, at *1.)

Plaintiffs' Response:  Undisputed.

112.    PwC Statement:  By letter dated March 26, 2002, the General Partner announced that it would liquidate and wind up the Partnership, which the Partnership has alleged it was forced to do at distressed prices. (Cutler Decl. Ex.  59; Cutler Decl. Ex. 70, at *44.)

Plaintiffs' Response:  Undisputed that "by letter dated March 26, 2002, the General Partner announced that it would liquidate and wind up the Partnership," but the remainder of the statement is disputed.  The Partnership has not alleged that it was "forced to do so" [i.e., liquidate the partnership] "at distressed prices," nor does the cited document support this statement.  On the contrary, the document (Cutler Dec. Ex. 70) sates that the Partnership's portfolio sales to date, in the course of the liquidation, "were accomplished within a fraction of 1% of independent third party low bids for these securities."

113.    PwC Statement:  After liquidating the Partnership's portfolio securities, Convertibles held approximately $362 million for distribution to the limited partners of Convertibles.  (Cutler Dec. Ex. 62.)

Plaintiffs' Response:  Undisputed.

114.    PwC Statement:  The General Partner hired BDO Seidman LLP ("BDO") to develop a plan for the distribution of Convertibles' net cash assets (the "BDO Plan").  (Cutler Decl. Ex. 60, at ¶ 43.)

Plaintiffs' Response:  Undisputed.

115.    PwC Statement:  The plan developed by BDO entailed a remarking of the securities held in the Partnership's portfolio from January 1995 to November 2001 at prices that generally were lower than those which the Partnership contemporaneously had reported to the limited partners.  (Cutler Decl. Ex. 61.)

Plaintiffs' Response:  Undisputed.

116.    <u>PwC Statement</u>:  On October 3, 2002, the General Partner filed with the Supreme Court of the State of New York, New York County (the "New York State Court") a Verified Petition for an order winding up Convertibles and approving distribution of the Partnership's assets in accordance with the BDO Plan. (Cutler Decl. Ex. 60.)

<u>Plaintiffs' Response</u>:  Undisputed.

117.    <u>PwC Statement</u>:  Several limited partners objected to the General Partners' proposal to distribute the assets in accordance with the BDO Plan, and litigation ensued.  (Cutler Decl. Ex. 62.)

<u>Plaintiffs' Response</u>:  Undisputed.

118.    <u>PwC Statement</u>:  Plaintiffs supported the adoption of the BDO Plan and the distribution scheme based on that Plan. (Cutler Decl. Exs. 63-64.)

<u>Plaintiffs' Response</u>:  Undisputed.

119.    <u>PwC Statement</u>:  In an Order filed April 11, 2003, the New York State Court removed Lipper Holdings as the liquidating trustee of Convertibles and ordered the appointment of a successor liquidating trustee to complete and oversee the winding up of Convertibles. (Cutler Decl. Ex. 62.)

<u>Plaintiffs' Response</u>:  Undisputed.

120.    <u>PwC Statement</u>:  On June 27, 2003, the New York State Court appointed Richard A. Williamson as successor liquidating trustee of the Partnership (the "Trustee"). (Cutler Decl. Ex, 65.)

<u>Plaintiffs' Response</u>:  Undisputed.

121.    <u>PwC Statement</u>:  On December 15, 2003, the Trustee submitted to the New York State Court a report which made a number of recommendations concerning the winding up of the Partnership. (Cutler Decl. Ex. 66.)

<u>Plaintiffs' Response</u>:  Undisputed.

122.    <u>PwC Statement</u>:  The Trustee's report included a revised BDO distribution plan (the "Revised BDO Plan"). (Cutler Decl. Ex. 67.)

<u>Plaintiffs' Response</u>:  Undisputed.

123.    <u>PwC Statement</u>:  The Revised BDO Plan incorporated certain changes that the New York State Court had ordered after considering objections to the original BDO Plan

raised in the Liquidation Proceeding. (Cutler Decl. Ex. 62; Cutler Decl. Ex. 67, at Page 1 to Analysis.)

Plaintiffs' Response:  Undisputed.

124.    PwC Statement:  The New York State Court again heard objections concerning the Trustee's report and Revised BDO Plan, and Plaintiffs supported the Revised BDO Plan. (Cutler Decl. Ex. 68.)

Plaintiffs' Response:  Undisputed.

125.    PwC Statement:  On February 13, 2004, the State Court filed an order which (i) authorized the distribution of the Partnership's assets in accordance with the Revised BDO Plan, and (ii) implemented most of the suggestions contained in the Trustee's report. (Cutler Decl. Ex. 69.)

Plaintiffs' Response:  Undisputed.

126.    PwC Statement:  In the February 13, 2004 Order, the state court authorized the Trustee to pursue such claims as the Partnership may have against its managers and any third parties. (Cutler Decl. Ex. 69.)

Plaintiffs' Response:  Undisputed.

<u>The Trustee's Lawsuit Against PwC</u>

127.    PwC Statement:  On July 2, 2004, the Trustee commenced an action against PwC asserting claims of negligence, fraud, breach of contract and breach of fiduciary duty the years ended December 31, 1995 through 2000.  (Cutler Decl. Ex. 70.)

Plaintiffs' Response:  Undisputed.

128.    PwC Statement:  Among other things, the Trustee's action sought to recover from PwC, on behalf of the Partnership:

         a.   The Partnership's overpayment of management and incentive fees to the General Partner;

         b.   The Partnership's overpayment of funds to withdrawing limited partners whose withdrawals were erroneously based on the inflated value of the Partnership's assets;

         c.   Losses incurred as a result of the liquidation of the Partnership's securities holdings at distressed prices.

(Cutler Dec. Ex. 70, at *43-44.)

Plaintiffs' Response:  Undisputed.

129.    <u>PwC Statement</u>:  Prior to the commencement of the Trustee's action against PwC, two limited partners commenced derivative actions against PwC, on behalf of the Partnership and one of its affiliate funds, in New York state court.  (Cutler Decl. Exs. 71-72.)

<u>Plaintiffs' Response</u>:  Undisputed.

130.    <u>PwC Statement</u>:  In light of the Trustee's complaint, the plaintiffs in the derivative actions filed against PwC in New York State Court consented to a stay of their actions. (Cutler Decl. Ex. 73.)

<u>Plaintiffs' Response</u>:  Undisputed.

131.    <u>PwC Statement</u>:  The Trustee's action against PwC has now been settled and, upon the effective date of the settlement, any and all claims the Trustee did or could have asserted against PwC will be released, and the Trustee action will be dismissed. (Cutler Decl. Ex. 74.)

<u>Plaintiffs' Response</u>:  Undisputed, except that upon information and belief, as of the date of this document, the state court has not given final approval to the settlement.

132.    <u>PwC Statement</u>:  The derivative actions commenced against PwC in the New York state court will also be released upon the effective date of settlement. (Cutler Decl. Ex. 74.)

<u>Plaintiffs' Response</u>:  Undisputed.

133.    <u>PwC Statement</u>:  The settlement of the Trustee's action against PwC has resulted in a $29.978 million payment by PwC.  (Cutler Decl. Ex. 74.)

<u>Plaintiffs' Response</u>:  Undisputed.

134.    <u>PwC Statement</u>:  The New York State Court held a fairness hearing in respect of the settlement and has stated on the record that the settlement amount and its distribution scheme are fair, reasonable and adequate. (Cutler Decl. Ex. 75, at *26-27; Cutler Decl. Ex. 76, at *25.)

<u>Plaintiffs' Response</u>:  Undisputed.

135.    <u>PwC Statement</u>:  The parties to the settlement have submitted a proposed final approval order to the New York State Court. (Cutler Decl. Ex. 77.)

<u>Plaintiffs' Response</u>:  Undisputed.

<u>Plaintiffs' Damages Claims</u>

136.    PwC Statement:  On October 18, 2005, PwC served Plaintiffs with damages interrogatories. (Cutler Decl. Ex. 49, at Nos. 3 and 4.)

Plaintiffs' Response:  Undisputed.

137.    PwC Statement:  On or about November 23, 2005, Plaintiffs responded, stating that they seek damages measured as the difference between the amount they invested in the Partnership or Series II, and the withdrawals and distributions they received from those funds. (Cutler Decl. Ex. 55, Response Nos. 3-4; Cutler Decl. Ex. 56, Response Nos. 3-4.)

Plaintiffs' Response:  Undisputed.

138.    PwC Statement:  The Lewin Action Plaintiffs calculated their damages as $345,534, plus pre-judgment interest.  (Cutler Decl. Ex. 55, Response No. 3.)

Plaintiffs' Response:  Undisputed.

139.    PwC Statement:  The CILP Action Plaintiffs calculated their damages amount as $1,316,017, plus pre-judgment interest.  (Cutler Decl. Ex. 56, Response No. 3.)

Plaintiffs' Response:  Undisputed.

140.    PwC Statement:  Plaintiffs expressly stated that they do not claim an entitlement to any other damages.  (Cutler Decl. Ex. 55, Response No. 4; Cutler Decl Ex. 56, Response No. 4.)

Plaintiffs' Response:  Undisputed.

141.    PwC Statement:  Plaintiffs have not proffered any expert to address their claimed damages.

Plaintiffs' Response:  Undisputed.

142.    PwC Statement:  The amounts Plaintiffs identify as amounts invested are the amounts that Plaintiffs claim they invested in Lipper Convertibles, L.P. ("Lipper Convertibles" or the "Partnership") or Lipper Convertibles Series II, L.P. ("Series II"), excluding the value of any transfer by Plaintiffs from Series II to Lipper Convertibles.  (Affidavit of Chudozie Okongwu dated May 28, 2010 ("Okongwu Aff."), at ¶ 4.)

Plaintiffs' Response:  Undisputed.

143.    PwC Statement:  Plaintiffs include in their "amounts invested" the amounts they invested in Series II. Accordingly, their computation of damages includes losses they suffered in Series II prior to investing in Lipper Convertibles. (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Undisputed for purposes of this motion, but only to the extent there were any such losses.

144.   <u>PwC Statement</u>:  To isolate Plaintiffs' losses in Lipper Convertibles alone, it is necessary to use the actual value of the in-kind transfer that Plaintiffs made from Series II to Lipper Convertibles in place of their Series II contributions.  (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Undisputed for purposes of this motion.

145.   <u>PwC Statement</u>:  The Trustee made distributions to the Plaintiffs that were based on Plaintiffs' June 30, 2002 capital balances as calculated by BDO. (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Undisputed.

146.   <u>PwC Statement</u>:  The difference between the Plaintiffs' net capital investments and their June 30, 2002 capital balances, as calculated by the BDO model, are exclusively a function of the three components identified in the following three paragraphs, each of which accrued to Plaintiffs in common with the other limited partners in Lipper Convertibles over the course of their investment in the Partnership, and none of which is unique to Plaintiffs or accrued at the moment of Plaintiffs' investment. (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Disputed.  This is a tautology, because the BDO model, by definition, as applied by Mr. Okongwu on behalf of PwC, assumes no mispricing of Convertibles in the first place.

147.   <u>PwC Statement</u>:  The first component of the diminution in Plaintiffs' partnership interests per the BDO model is the "As Adjusted" net income (loss) calculated by the BDO model and distributed to the Limited Partners ("LPs") on a pro rata basis in accordance with their As Adjusted capital ownership percentages in the BDO model.  (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Disputed.  Plaintiffs calculated damages using the rescissionary method permitted by courts in 10b-5 cases.  PwC provided no factual evidence of any trading or "fire sale" losses.

148.   <u>PwC Statement</u>:  The second component of the diminution in Plaintiffs' partnership interests per the BDO model is the net charges applied to the LPs' As Adjusted capital accounts on a pro rata basis in accordance with their As Adjusted capital ownership percentages in the BDO model to account for computed overwithdrawals from the fund by withdrawing LPs. (Okongwu Aff., at ¶ 4.)

<u>Plaintiffs' Response</u>:  Disputed.  Plaintiffs calculated damages using the rescissionary method permitted by courts in 10b-5 cases.

149.   <u>PwC Statement</u>:  The third component of the diminution in Plaintiffs' partnership interests per the BDO model is the net charges applied to the LPs' As Adjusted capital accounts on a pro rata basis in accordance with their As Adjusted capital ownership percentages in

the BDO model to account for computed overwithdrawals from the fund by the General Partner. (Okongwu Aff., at ¶ 4.)

Plaintiffs' Response:  Disputed.  Plaintiffs calculated damages using the rescissionary method permitted by courts in 10b-5 cases.

## PLAINTIFFS' COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH THERE EXIST A GENUINE ISSUE FOR TRIAL

1.     In auditing Lipper Convertibles, PwC did not rely on any findings by the NASD in the course of its audits of Lipper Convertibles. Orel Dec., Ex. A at 587-88; Ex. E at 196-97.

2.     The NASD did not conduct GAAS audits of Lipper Convertibles.  Orel Dec., Ex. A at 588; Ex. U at 55-57; Ex. DD at 51-52.

3.     PwC was aware that the NASD did not conduct GAAS audits of Lipper Convertibles.  Orel Dec., Ex. A at 588.

4.     The documents attached as Exhibits 38-44 to the Cutler Declaration were not produced by PwC in the course of this litigation and thus were not maintained in PwC's workpapers for its Lipper Convertibles audits.  Orel Dec., ¶ 37.

5.     Ed Strafaci, former head trader at Lipper Convertibles, pleaded guilty to ne count of securities fraud before the Hon. Laura Taylor Swain, U.S.D.J.  Orel Dec., Ex. Z.

6.     Mr. Strafaci admitted that he had marked Lipper Convertibles' portfolio in a manner not compliant with the Lipper Convertibles partnership agreement.  Orel Dec., Ex. Y.

7.     Mr. Strafaci admitted that he did not mark the Lipper Convertibles' portfolio at market.  Orel Dec., Ex. Y.

8.   Mr. Strafaci was sentenced to six years in federal prison.  Orel Dec., Ex. CC; information available on PACER, docket entry no. 33 in *U.S. v. Strafaci*, 03 Crim. 1182.

9.   PwC was aware that Strafaci's marks were not based on market quotations. Orel Dec., Ex. A at 86; Ex. E at 19, 163.

10.   Strafaci told PwC that his marks consisted of his subjective additions to broker quotes.  Orel Dec., Ex. A at 184; Ex. E at 19, 163; Cutler Dec., Ex. 16 at 2-4.

11.   Lawrence A. Stoler was the PwC engagement partner for Lipper Convertibles for the 1995, 1998, 1999 and 2000 audits, and had served in that capacity during earlier audits going back into the late 1980s.  Orel Dec. Ex. II, ¶ 6.

12.   When Lipper Convertibles first hired PwC, Mr. Stoler was their primary contact.  Orel Dec., Ex. P at   .

13.   PwC was aware at all relevant times that Mr. Strafaci was not marking his portfolio to the market.  Orel Dec., Ex. A at   ; Ex. E at 19, 163.

14.   PwC never qualified its audit opinions regarding the financial condition of Lipper Convertibles.  Cutler Dec., Exs. 6-10.

15.   For virtually every security in Lipper Convertibles' portfolio for every audit year in question for which PwC obtained independent pricing information, Strafaci's marks were higher than marks PwC obtained from independent sources.  Cutler Dec., Exs. 23-33.

16.   Plaintiffs opted out of the state court certified class action, and as a result are precluded from participating in the proposed settlement according to its terms unless they first release their claims against PwC.  Cutler Dec., Ex.  74.

17.   Plaintiffs have not agreed to release their claims against PwC and hence are ineligible to participate in the state court settlement according to its terms.  Cutler Dec., Ex. 74.

18.   PwC failed to modify or tailor its audit plan or program in response to an identified risk of material misstatement due to fraud. This includes the nature and extent of its procedures, the level of professional skepticism to be applied, or the assignment of personnel to specific responsibilities.  Cutler Dec., Ex. 16 at 1-3.

19.   PwC failed to identify the absence of controls over the valuation of securities, the use of subjective judgments in such valuations, or the vague and implausible response that it received to its questions about such valuations as risk factors of material misstatement due to fraud.  Cutler Dec., Ex. 16 at 1-3.

20.   PwC did not prepare an audit response designed to specifically address any of the risk factors of material misstatement due to fraud.  Cutler Dec., Ex. 16 at 1-3.

21.   There is no documentation in PwC's workpapers that it considered the risks associated with the fact that nearly all values obtained by PwC from independent sources were lower than the values estimated by Mr. Strafaci.  Cutler Dec., Ex. 16 at 1-3 to 1-4.

22.   PwC did not know if Strafaci used any modeling methodology.  Orel Dec., Ex. A at 105.

23.   There is no documentation that PwC ever saw or reviewed any documentation supporting Strafaci's valuations.  Cutler Dec., Ex. 16 at 2-5.

24.   At all relevant times, there were readily available market quotations for the convertible securities held by Lipper Convertibles.  Orel Dec., Ex. A at 86.

25.   At all relevant times, PwC was aware that Strafaci was not valuing the long portfolio of Lipper Convertibles by using broker quotes.  Orel Dec., Ex. A at 183-84.

26.   There is no documentation in PwC's workpapers of any conclusion not to rely on clearing broker valuations for the securities in Lipper Convertibles' portfolio.  Cutler Dec., Ex. 16 at 2-18.

27.   There is no documentation in PwC's workpapers that PwC personnel at any level of experience examined evidence supporting management's explanations for the valuation differences between Strafaci and independent sources such as Bloomberg, broker quotes or clearing broker statements.  Cutler Dec., Ex. 16 at 2-7.

28.   .No PwC personnel at any level of experience ever examined evidence supporting management's explanations for the valuation differences between Strafaci and independent sources such as Bloomberg, broker quotes or clearing broker statements.  Cutler Dec., Ex. 16 a 2-7.

29.   Nothing in PwC's workpapers indicates that it did anything to corroborate any of the representations made or explanations given by Mr. Strafaci in support of the differences between his values and the independent values obtained by PwC.  Cutler Dec., Ex. 16 a 2-7.

30.   PwC never reviewed and tested the process used by Mr. Strafaci, developed an independent expectation of his estimated values.  Cutler Dec., Ex. 16 at 2-10.

31.   PwC did not attempt to determine whether the Lipper Convertibles' (and Lipper Convertibles Series II) valuation methods conformed with their stated policies.  Orel Dec., Ex. A at 242.

32.   There is no indication in PwC's workpapers that it considered the impact of the difference between Strafaci's values and the values obtained by PwC from independent

sources with respect to individual amounts, subtotals or totals in Convertibles' financial

statements.  Cutler Dec., Ex. 13 at 6.


Dated: New York, New York
       July 15, 2010

                                    WOLF HALDENSTEIN ADLER FREEMAN
                                       & HERZ LLP

                                    By: _____
                                         Eric B. Levine (EL 3270)
                                         Daniel Krasner (DK 6381)
                                         Gregory M. Nespole (GN 6820)
                                         Stephen H. Orel (SO 9198)
                                    Attorneys for Plaintiffs
                                    270 Madison Avenue
                                    New York, NY 10016
                                    (212) 545-4600

/581688.1